IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

THOMAS G. FIGANIAK and
VALERIE A. FIGANIAK, as
Administrators of the
Estate of Kevin Figaniak,

      Plaintiffs,

v.                                   Civil Action No. 5:15CV111
                                             (STAMP)

FRATERNAL ORDER OF OWL'S HOME NEST,
LOYAL ORDER OF OWLS NEST LODGE 2558,
d/b/a THE OWLS NEST,
a West Virginia corporation,
YE OLDE ALPHA, INC.,
a West Virginia corporation,
CRAIG TYLER PEACOCK, individually,
JARRETT CHANDLER, individually,
and TYLER JOHNSON, individually,

      Defendants.


## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT TYLER JOHNSON'S MOTION FOR SUMMARY JUDGMENT

      This is a wrongful death action arising out of a fight, resulting in the death of Kevin Figaniak ("Kevin"). Kevin's parents filed this civil action as administrators of his estate, alleging negligence claims against the participants in the fight. One of those participants, Tyler Johnson, filed a motion for summary judgment. For the following reasons, that motion is denied.

### I.   Facts

      Kevin Figaniak and his friend Tyler Johnson ("Johnson") were both students at Wheeling Jesuit University in Wheeling, West

Virginia and were on the University's lacrosse team. ECF No. 138-5 at 8. The young men went out drinking together at Ye Olde Alpha, Inc. ("the Alpha"), a local bar and restaurant. ECF No. 138-1 at 3. After several hours of drinking, they left the Alpha as it was closing and began walking back to the Wheeling Jesuit University campus where they lived.

As the young men were walking down the block, they passed another bar, the Loyal Order of Owls Nest Lodge 2558 ("the Owls Nest"). At that time, Craig Tyler Peacock ("Peacock"), Jarrett Chandler ("Chandler"), and Tyler Witty ("Witty") exited the Owls Nest and began walking to the Alpha. ECF No. 138-3 at 6. The groups converged, and Johnson told them the Alpha was closing. Id. Peacock, Chandler and Witty then began walking back to Witty's pickup truck parked next to the Owls Nest. Id. at 9.

The young men initially engaged in friendly conversation. Id. at 6; ECF No. 138-7 at 3. Johnson then asked Peacock if they were in college and where they went to school. ECF No. 138-3 at 6; 138-7 at 3-4. Peacock responded that they were "pipeliners," working as welders in the construction of natural gas pipelines in the area. ECF No. 138-3 at 6; 138-7 at 4. Johnson then responded with some variation of "Oh, that's right. You don't need a f*****g education for that." ECF No. 138-3 at 6; 138-7 at 4. Peacock took offense to Johnson's comment, believing Johnson was expressing elitism and was putting down blue-collar workers. ECF No. 138-3 at

6, 8.  The young men then began trading insults and arguing.  Id.
at 5, 9.  Johnson testified at his deposition that he did not
remember this interaction due to his level of intoxication and the
passage of time.  ECF No. 138-1 at 5-6.

Johnson and Kevin continued walking down the street toward
campus and into a residential neighborhood.  ECF No. 138-3 at 9.
However, the young mens' argument continued.  Peacock and Witty
testified in their depositions that as Johnson and Kevin walked,
Johnson turned around several times and yelled back at them,
"baiting" them into continuing the argument and following.  Id. at
5-6, 8-9; ECF No. 138-7 at 6.  Johnson testified in his deposition
that it was Kevin who continued to turn around and yell or smile at
Peacock and Witty, and that he attempted to get Kevin to cease his
actions and to continue walking.  ECF No. 138-1 at 4, 7.  It is
undisputed that Peacock argued back and that he and Witty continued
to follow Kevin and Johnson.  ECF No. 138-3 at 9.  Peacock
testified in his deposition that generally all of them exchanged
insults, including Kevin.  Id. at 11-12.  However, he also
testified specifically that he did not recall Kevin saying anything
or turning around to yell or smile.  Id. at 12.  At this time,
Chandler was urinating near Witty's truck back at the Owls Nest,
and then caught up with the group.  ECF No. 134-4 at 6-7.

Peacock, Witty, and Chandler caught up to Kevin and Johnson,
and the argument continued face-to-face on the sidewalk along

3

Locust Avenue in a residential neighborhood. ECF No. 138-2 at 3; 138-3 at 12. Chandler testified in his deposition that he attempted to end the confrontation. ECF No. 134-4 at 8; 138-2 at 3. Witty testified in his deposition that Kevin seemed intent on fighting. ECF No. 138-7 at 6. Kevin then pushed Chandler. ECF No. 138-2 at 4; ECF No. 138-7 at 6-7. Chandler responded by punching Kevin on the chin. ECF No. 138-2 at 4. Kevin twisted slightly and fell back, landing on the ground face up. Id. Johnson and Witty testified in their depositions that Kevin fell back onto the sidewalk and that the back of his head hit the concrete. ECF No. 138-7 at 7; 134-2 at 15, 18. Chandler testified in his deposition that Kevin fell back into a grassy area and that his head landed in the grass rather than on the concrete. See ECF No. 138 at 27.

Johnson then punched and pushed Peacock and turned to run but was tackled by Peacock, who then struck him several times while sitting on top of him. ECF No. 138-2 at 5; 138-3 at 3. Chandler testified that he tried to pull Peacock off of Johnson. ECF No. 138-2 at 5. However, Peacock denies this. ECF No. 138-3 at 4. Chandler then fled the scene and ran back to Witty's truck parked near the Owls Nest. ECF No. 138-2 at 5; 138-3 at 9. Witty pulled Peacock off of Johnson, and he and Peacock then ran back to Witty's truck. ECF No. 138-3 at 9; 138-7 at 8. As the two ran away, Peacock's foot came into contact with Kevin's head. ECF No. 138-7

4

at 8.  Witty later told police he believed Peacock intentionally kicked Kevin but has since testified in his deposition that he believed Peacock tripped over Kevin's head.  <u>Id.</u> at 8-9.  Peacock testified in his deposition that he did not recall intentionally kicking Kevin and that if his foot contacted Kevin's head it happened unintentionally when he "leaped over him."  ECF No. 138-3 at 3.  After the young men got to the truck, they drove to Jill's Lounge and Gentlemen's Club, a strip club in Triadelphia, West Virginia and continued drinking.  <u>Id.</u> at 9.

After Witty and Peacock fled, Johnson knocked on the doors of nearby houses.  ECF No. 138-5 at 5.  Robert Hartley ("Hartley") awoke and answered.  <u>Id.</u>  Johnson, in a panicked state, asked Hartley to help him move Kevin back to campus, but Hartley told Johnson that Kevin needed medical attention and that it was not a good idea to move him.  ECF No. 138-4 at 3, 6.  Johnson then offered to pay Hartley for his help and asked him not to call the police.  <u>Id.</u> at 6.  Hartley refused, and his neighbor then called 9-1-1.  ECF No. 138-5 at 5.

Johnson then attempted to move Kevin on his own by lifting Kevin's shoulders from behind.  ECF No. 138-1 at 11-12; 138-4 at 3-4.  However, Johnson was unable to lift Kevin beyond a sitting position and Kevin slipped from Johnson's grip.  ECF No. 138-1 at 12; ECF No. 138-4 at 5.  Kevin fell to the left into the grass and "kind of face planted into the grass next to his legs."  ECF No.

5

138-4 at 4. Johnson attempted to lift Kevin again, but Hartley protested, and Johnson laid Kevin back down. Id. However, as Johnson was laying Kevin down, Kevin's head snapped backwards and fell about ten inches, hitting the sidewalk. ECF No. 138-1 at 12; 138-4 at 4-5.

Hartley testified at his deposition that when he first saw Kevin, he was laying flat on his back with his waist and legs laying in the grass and his torso and head on the sidewalk. ECF No. 138-4 at 3. Hartley said Kevin appeared to be unconscious, that he never moved, and that his breathing was labored and "gurgling." Id. at 3-4. Hartley said that Kevin's condition did not appear to change at any point, even after Johnson attempted to lift him. Id. at 5-6.

An ambulance arrived and rushed Kevin to the hospital. ECF No. 138-5 at 3-4. Treating physicians at Wheeling Hospital completed a computerized axial tomography scan of Kevin, finding severe bleeding on his brain and a fracture in his skull from "near his right temple area around to the back of his head." Id. at 7. The attending neurosurgeon concluded that Kevin was "in a coma due to traumatic brain injury including damage to approximately 3/4 of his brain stem." Id. Kevin was placed on life support and transferred to UPMC Presbyterian Hospital in Pittsburgh, Pennsylvania but died the next day. Id. at 5, 8.

After an autopsy, the Chief Medical Examiner for the City of Wheeling, Jimmie K.A. Smith, M.D., concluded that the cause of death was subdural hematoma, a collection of blood between the brain surface and the protective covering of the brain caused by traumatic brain injury. ECF No. 136-1 at 4. He found that the back of Kevin's skull was fractured, that Kevin had abrasions on the back of his head and above his left eye, and that Kevin's brain showed signs of at least one blow to the back of his head, and blows to the left and right sides of his head. Id. at 4-5. He concluded that Kevin's death was caused by several blows to the head and that he was not able to separate those blows as individually sufficient to cause death. Id. at 9-12. Dr. Smith is also listed as an expert witness for Chandler. Joseph Burton, M.D., Johnson's expert, concluded that Kevin's initial fall onto the sidewalk would have been sufficient to cause his death, ECF No. 134-10 at 9, while Wayne K. Ross, M.D., the plaintiffs' expert, concluded that it would not have been sufficient to cause Kevin's death. ECF No. 134-11 at 8.

Chandler later plead guilty to involuntary manslaughter for Kevin's death. Peacock was charged with murder and was acquitted after a jury trial. Johnson was not criminally charged in relation to the fight.

Kevin's parents filed this civil action on behalf of Kevin's estate against Johnson, Peacock, Chandler.[1] The plaintiffs allege negligence, wrongful death, and survivorship claims against Johnson, Peacock, and Chandler; and assault and battery claims against Peacock and Chandler. Each defendant filed crossclaims for contribution and implied indemnification against each other defendant. Johnson filed a motion for summary judgement, which the plaintiffs, Chandler, and Peacock oppose.

## II. Applicable Law

Under Federal Rule of Civil Procedure 56, this Court must grant a party's motion for summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the case. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." Id. If the nonmoving party "fails to make a showing sufficient to establish

---

[1]Originally, the plaintiffs also alleged negligence claims against the Owls Nest, the Alpha, and the Fraternal Order of Owl's Home Nest ("Fraternal Order"). The parties voluntarily dismissed their claims, including the crossclaims, against Fraternal Order, and it is no longer a party to this action. Further, the plaintiffs settled their claims against the Alpha and the Owls Nest, and this Court approved that settlement under West Virginia Code § 55-7-7. As part of that settlement, all crossclaims against the Alpha and the Owls Nest were dismissed with prejudice. Thus, the only remaining defendants are Johnson, Chandler, and Peacock.

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted against that party. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. <u>See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. <u>See Celotex</u>, 477 U.S. at 322-23. "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." <u>Temkin v. Frederick County Comm'rs</u>, 945 F.2d 716, 718 (4th Cir. 1991), <u>cert. denied</u>, 502 U.S. 1095 (1992). However, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986). Moreover, "[t]he nonmoving party cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." <u>Othentec Ltd. v. Phelan</u>, 526 F.3d 135, 140 (4th Cir. 2008) (internal quotation marks omitted). The nonmoving party must produce "more than a 'scintilla'" of evidence "upon which a jury could properly proceed to find a verdict for the party producing

it." Id. (internal quotation marks omitted) (quoting Anderson, 477
U.S. at 251).

## III.  Discussion

Johnson seeks summary judgment on the plaintiffs' negligence
and wrongful death claims against him.  To maintain their wrongful
death claim, the plaintiffs, as Kevin's beneficiaries, must show
that Kevin's death was caused by Johnson's negligence.  Bradshaw v.
Soulsby, 558 S.E.2d 681, 687 (W. Va. 2001); see also W. Va. Code
§ 55-7-5.  To prove negligence, the plaintiffs must show: (1) that
Johnson owed Kevin a duty; (2) that Johnson negligently breached
that duty; (3) that Kevin was injured by Johnson's breach; and (4)
that Kevin's injuries were proximately caused by Johnson's breach.
Wheeling Park Comm'n v. Dattoli, 7897 S.E.2d 546, 551 (W. Va.
2016).

The plaintiffs allege two distinct negligence claims against
Johnson; that he negligently instigated the fight, and that he
negligently caused further injury when he attempted to move Kevin.
Johnson argues that he did not owe Kevin a duty to prevent the
fight or to provide aid, that his alleged breach did not cause
Kevin's death, that his actions were not the proximate cause of
Kevin's death, and that Johnson is immune from liability for
Kevin's post-fight injuries under West Virginia's "good Samaritan"
statute.

A.  <u>Pre-Fight Negligence</u>

Johnson seeks summary judgment as to his actions before the fight.  He argues that he did not owe Kevin a duty of care regarding the lead-up to the fight because it was not foreseeable that Kevin would be injured as a result of Johnson's verbal argument with Peacock.  Further, Johnson argues that his negligence was not the proximate cause of Kevin's death.

1.  <u>Duty</u>

Generally, one has a duty "to conform to the legal standard of reasonable conduct in light of the apparent risk" in a given situation.  <u>Id.</u> (internal quotation marks omitted).  In determining the scope of that duty in a particular situation, courts must consider the foreseeability of harm, "the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant," along with other "broader policy consideration . . . [that] are not so readily articulated."  <u>Id.</u> at 568.  However, "[t]he ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised."  <u>Marcus v. Staubs</u>, 736 S.E.2d 360, 370 (W. Va. 2012) (internal quotation marks omitted).  "The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?"  <u>Id.</u> (internal quotation marks omitted).  Regardless, generally "one who

11

engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm." Robertson v. LeMaster, 301 S.E.2d 563, 567 (W. Va. 1983).

While the issue of duty is one of law for the court, Aikens v. Debow, 541 S.E.2d 576, 580 (W. Va. 2000), "the court must leave room for the fact-finder to determine the issue of foreseeability." Marcus, 736 S.E.2d at 370. The court must determine "in general terms whether the type of conduct at issue is sufficiently likely to result in the kind of harm experienced based on the evidence presented," while the jury "has the more specific job of considering the likelihood or foreseeability of the injury sustained under the particular facts of the case in order to decide whether the defendant was negligent in that his or her conduct fell within the scope of the duty defined by the court." Id. at 370-71. Thus, "[w]hen the facts are in dispute, the court identifies the existence of the duty conditioned upon the jury's possible evidentiary finding." Id. at 371 (internal quotation marks omitted) (alteration in original).

The plaintiffs allege Johnson was negligent in instigating a fight with Peacock and Chandler. Johnson argues that it was not foreseeable that his comment to Peacock would result in Peacock and Witty "stalking" him and Kevin and ultimately assaulting them.

Thus, the question is whether a reasonable person in Johnson's position would have known or should have known that his insults and arguing could lead to a fight in which Kevin would be injured.

First, this Court notes that the record is filled with conflicting evidence as to what Johnson said to Peacock, whether Johnson or Kevin continued the argument as they walked back to the Wheeling Jesuit University campus, how the fight started, and what specifically happened during the fight. This conflicting testimony presents a host of credibility issues that this Court may not determine on summary judgment. Gray v. Spillman, 925 F.2d 90, 95 (4th Cir. 1991). Further, questions of who insulted whom, who continued the argument, and how the young men came to physically fight all bear on the foreseeability issue.

Second, taking the evidence in the plaintiffs' best light, not only did Johnson insult Peacock, he continued to do so as he and Kevin walked back to the Wheeling Jesuit University campus. Johnson's continued insults and arguing "baited" Peacock and Witty into following him and Kevin, increasing the likelihood of a physical confrontation. With these facts, a reasonable jury could conclude that a reasonable person in Johnson's position would know or should know that insulting Peacock and continuing to argue with him created an unreasonable risk of physical confrontation that could result in Kevin being injured.

Nevertheless, Johnson argues that he did not have a duty to protect Kevin from the deliberate criminal conduct of Chandler and Peacock. He relies on <u>Miller v. Whitworth</u>, 455 S.E.2d 821 (W. Va. 1995), in which the West Virginia Supreme Court of Appeals stated that "[g]enerally, a person does not have a duty to protect others from the deliberate criminal conduct of third parties." <u>Id.</u> at 825. However, the court went on to explain that "a person usually has no duty to protect others from the criminal activity of a third party because the foreseeability of risk is slight, and because of the social and economic consequences of placing such a duty on a person." <u>Id.</u> Later, in <u>Marcus v. Staubs</u>, 736 S.E.2d 360 (W. Va. 2012), the court characterized its statement in <u>Miller</u> as dicta and explained that a duty to protect may arise "where (1) there is a 'special relationship' which gives rise to a duty or (2) 'when the person's affirmative actions or omissions have exposed another to a foreseeable high risk of harm from the intentional misconduct.'" <u>Id.</u> at 369-70.

The evidence, taken in the plaintiffs' best light, shows that Johnson's affirmative actions exposed Kevin to a foreseeably high risk of being assaulted and battered. As discussed more fully below in the context of proximate causation, a reasonable jury may find that the fight, including Chandler and Peacock's "deliberate criminal conduct," was a foreseeable result of Johnson's insult to and continued antagonization of Peacock.

14

Johnson further argues that his insult to Peacock did not constitute "fighting words" such that it was not reasonable to expect a fight. However, the fighting words doctrine applies in determining whether speech is protected under the Free Speech Clause of the First Amendment, not negligence law. <u>See e.g.</u>, <u>R.A.V. v. City of St. Paul, Minn.</u>, 505 U.S. 377 (1992). The question here is whether Johnson's insults and arguments could foreseeably lead to a fight, not whether Johnson's statements constitute protected speech.

This Court conditionally finds that Johnson owed Kevin a duty of care to not instigate the fight, conditioned upon the jury's findings of fact regarding the circumstances leading up to the fight and regarding the foreseeability of Kevin's injuries.

2.  <u>Proximate Causation</u>

Johnson argues that any breach of his duty to Kevin was not the proximate cause of Kevin's death. He asserts that the causal chain was broken by Kevin, Chandler, and Peacock's intentional "criminal acts." Specifically, he claims that Peacock's following of Kevin and him constituted criminal stalking, that Kevin and Chandler's physical contacts with each other constituted criminal battery, and that Chandler committed involuntary manslaughter. Johnson argues that these actions were intervening causes of Kevin's death, absolving him of his negligence.

15

Generally, the "proximate cause of an injury is the last negligent act contributing to the injury and without which the injury would not have occurred." Sergent v. City of Charleston, 549 S.E.2d 311, 320 (W. Va. 2001). However, "no one defendant need be the sole cause of the injury." Louk v. Isuzu Motors, Inc., 479 S.E.2d 911, 923 (W. Va. 1996). Where "the negligence of two or more parties concurred in time and place and the negligence of each proximately contributed to the resulting harm," the plaintiff may recover from each negligent party. Id.

One's negligence may be discharged if there was some intervening cause of the plaintiff's injury. Robertson, 301 S.E.2d at 569. The intervening cause "must be a negligent act, or omission, which constitutes a new effective cause and operates independently of any other act, making it and it only, the proximate cause of the injury." Id. (internal quotation marks omitted). However, "if the intervening cause is one which is to be reasonably anticipated, the defendant may be liable, for '[t]he risk created by the defendant may include the intervention of the foreseeable negligence of others.'" Id. at 570 (alteration in original).

Johnson argues that another's intentional criminal conduct is necessarily an intervening cause, relying on the decisions of the West Virginia Supreme Court of Appeals in Sergent v. City of Charleston, 549 S.E.2d 311 (W. Va. 2001), and Yourtee v. Hubbard,

16

474 S.E.2d 613 (W. Va. 1996), and the court's unpublished decision in Ayers v. Erie Insurance Company, No. 14-0843, 2015 WL 3675302 (W. Va. June 12, 2015). However, these cases do not stand for the proposition that a subsequent tortfeasor's criminal acts are necessarily an intervening cause. Rather, in each case the court reinforced the principle that a third party's negligent, reckless, intentional, or criminal acts are not an intervening cause if those acts were reasonably foreseeable at the time of the original tortfeasor's negligence. Id.; Sergent, 549 S.E.2d at 320-21; Yourtee, 474 S.E.2d at 620-21.

In Sergent, the West Virginia Supreme Court of Appeals concluded that police officers were not liable for the death of a bicyclist during an unexpected high speed chase because the suspects' reckless flight was not reasonably foreseeable to the officers when an undercover operation unexpectedly created a confrontation. 549 S.E.2d at 320-21. Similarly, in Yourtee, the court concluded that the defendant was not liable where the plaintiff and a friend stole the defendant's unlocked vehicle, taking it for a joy ride, resulting in an accident and the plaintiff's death because the thieves' actions were not reasonably foreseeable to the defendant at the time he left his vehicle unlocked. 474 S.E.2d at 620-21. In Ayers, the defendant was physically assaulted by her daughter, and when the defendant asked the plaintiff to call the police, her daughter then attacked the

plaintiff. <u>Id.</u> at *4. The Court held that the defendant did not negligently cause the plaintiff's resulting injuries because her daughter's actions were not reasonably foreseeable. <u>Id.</u> In no way do these cases purport to create a rule that another's criminal conduct is necessarily an intervening cause.

As discussed above, a reasonable jury may find that the fight and Kevin's resulting injuries and death were foreseeable results of Johnson's actions. Viewing the facts in the plaintiffs' best light, a reasonable jury could find that Kevin, Chandler, and Peacock's "criminal" acts would foreseeably result from Johnson's instigation of the fight. Further, any contribution Kevin made to causing the fight is a question of comparative negligence and apportionment of fault; a factual determination for the jury, which this Court may not determine based on conflicting evidence. <u>Reager v. Anderson</u>, 371 S.E.2d 619, 625 (W. Va. 1988).

B. <u>Post-Fight Negligence</u>

Johnson argues that he was not obligated to assist Kevin in any way after the fight. Further, he argues that his negligence did not cause Kevin's death or any physical pain or suffering. Alternatively, Johnson argues that he is immune from any liability under West Virginia's "good Samaritan" statute.

1. <u>Duty</u>

Johnson argues that he was not obligated to assist Kevin after the fight. He relies on West Virginia Code § 17C-4-3, which he

argues is the sole statutory authority for finding an affirmative duty to provide aid.

However, § 17C-4-3 deals with a driver's duty to provide information and aid to persons involved in a motor vehicle accident with the driver. Clearly, the provision serves to supplement common law duties to render aid, not to limit them.

As stated above, one whose affirmative conduct creates an unreasonable risk of harm to another has an affirmative duty of reasonable care to prevent that harm. <u>Robertson</u>, 301 S.E.2d at 567. This includes a duty to aid someone made helpless by the tortfeasor's conduct. <u>See</u> Restatement (Second) of Torts § 322 (1965) ("If the actor knows or has reason to know that by his conduct, whether tortious or innocent, he has caused such bodily harm to another as to make him helpless and in danger of further harm, the actor is under a duty to exercise reasonable care to prevent such further harm."). Thus, if the jury finds that Johnson's affirmative conduct created the risk of Kevin's injuries, Johnson had an affirmative duty to use reasonable care to prevent further harm to Kevin after the fight.

2. <u>Cause of Death</u>

Johnson argues that his post-fight negligence in attempting to move Kevin did not cause Kevin's death or any additional pain or suffering. He argues that Kevin's initial fall onto the sidewalk was sufficient to cause his death such that he did not cause

further damage by allowing Kevin's head to hit the ground twice more. Specifically, Johnson argues that all "credible" experts agree that an unbroken fall from standing height onto concrete would be sufficient to cause a skull fracture, subdural hematoma, and death.

"[T]he issue of apportionment of negligence or causation is one for the jury or other trier of the facts, and only in the clearest of cases where the facts are undisputed and reasonable minds can draw but one inference from them should such issue be determined as a matter of law." Reager, 371 S.E.2d at 625.

The parties offer competing expert testimony regarding the cause of Kevin's death. Dr. Joseph Burton concluded that Kevin's initial fall was sufficient to cause death, ECF No. 134-10 at 9, while Dr. Wayne Ross and Dr. Jimmie K.A. Smith stated that they cannot conclude to a degree of medical certainty which blow caused Kevin's death. ECF No. 134-11 at 8. Clearly, this conflicting expert testimony presents credibility determinations for the jury. A reasonable jury could find that the blows to Kevin's head when Johnson tried to move him contributed to Kevin's traumatic brain injury, making death more likely than it may have been after only his initial fall. Thus, summary judgment is not proper as to this issue.

3.  <u>Good Samaritan Statute</u>

Johnson alternatively argues that he is immune from any liability for his attempts to move Kevin under West Virginia's "good Samaritan" statute, W. Va. Code § 55-7-15.  Section 55-7-15 provides that "[n]o person . . . who in good faith renders emergency care at the scene of an accident or to a victim at the scene of a crime, without remuneration, shall be liable for any civil damages as the result of any act or omission in rendering such emergency care."  W. Va. Code § 55-7-15.

"This statute was designed to encourage those persons owing no duty to render aid in emergency circumstances.  It was not intended to relieve one of liability for the breach of a pre-existing duty." <u>Hovermale v. Berkeley Springs Moose Lodge No. 1483</u>, 271 S.E.2d 335, 341 (W. Va. 1980).  Thus, if the jury finds that Johnson's negligence in instigating the fight contributed to Kevin's injury, § 55-7-15 cannot absolve him of his liability for breaching his duty to prevent further harm to Kevin.

Further, there are genuine disputes of fact regarding Johnson's motives in attempting to move Kevin and whether his actions constitute a good faith attempt to render "emergency care." Hartley's deposition testimony tends to show that Johnson was more interested in avoiding trouble with the law or the University than he was in Kevin's heath and safety.  Thus, a reasonable jury could

find that Johnson attempted to move Kevin to avoid personal trouble rather than to render emergency aid.

## IV. <u>Conclusion</u>

For the above reasons, this Court finds there are genuine issues of material fact as to Johnson's liability. Accordingly, Johnson's motion for summary judgment is (ECF No. 133) DENIED.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein.

DATED:    June 19, 2017


                              /s/ Frederick P. Stamp, Jr.
                              FREDERICK P. STAMP, JR.
                              UNITED STATES DISTRICT JUDGE